AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Mississippi

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| Velma M. White | ) |
|  | ) |
|  | ) |
|  | ) |
| _____ | ) |
| *Defendant(s)* | |

**Filed**

JUG 3 1 2017

U.S. Magistrate Judge

Case No. 3:17-mj-577-FKB

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of ___August 23 - August 30, 2017___ in the county of ___Rankin___ in the
___Southern___ District of ___Mississippi___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. section1958 | Use of interstate commerce facilities in the commission of murder-for-hire |

This criminal complaint is based on these facts:

See Affidavit, attached hereto and incorporated fully herein by reference.

☐ Continued on the attached sheet.

_____  ATF SA
*Complainant's signature*

Braden C. Theobald, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __8/31/2017__

_____
*Judge's signature*

City and state: ___Jackson, Mississippi___

F. Keith Ball, U.S. Magistrate Judge
*Printed name and title*

**Affidavit**

I, Braden Theobald, being duly sworn state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives

(herein after referred to as "ATF"), currently assigned to the Jackson, Mississippi Field Office.  I

have been so employed for approximately two (2) years.  My formal education includes a

Bachelors degree in Criminal Justice from the University of Mississippi. I have also successfully

completed the Criminal Investigator Training Program and the ATF Special Agent Basic

Training program at the Federal Law Enforcement Training Center in Glynco, Georgia.


2.      This affidavit is submitted in support of the issuance of a complaint against Velma M.

WHITE for using an interstate commerce facility in the commission of a murder-for-hire, in

violation of Title 18, United States Code, Section 1958. I make this affidavit with personal

knowledge based on my participation in this investigation and upon the information gathered by

other participating law enforcement officers, and information gained through my training and

experience. The information outlined below is provided for the limited purpose of establishing

probable cause and does not contain all of the details or facts related to this investigation of

which I am aware.


3.      This affidavit describes portions of recorded conversations. To the extent that such

communications are summarized, those summaries do not necessarily refer to all the topics

covered during the conversation. In addition, the summaries do not include every conversation

made by each speaker on the topic being described. For some conversations, I have offered in

parentheses my understandings and/or interpretations of the conversations. My understandings

and/or interpretations are based upon my experience and knowledge of the investigation to date, the content and context of the conversations, the experience of other ATF Special Agents with whom I have consulted, and my training and experience.

## The Cooperating Source

4.    On August 11, 2017, United States Marshal's Service (USMS) Gulf Coast Regional Fugitive Task Force (GCRFTF) Officer Pam Turner and I met with a confidential source (hereafter the "CS"). The CS stated that he had been approached by Velma M. WHITE about having her brother killed in an attempt to collect on an insurance policy that WHITE held on the intended victim. The CS explained that WHITE stood to collect $50,000 from the policy and was willing to give the CS $20,000 to either kill the victim or to have the victim killed.

5.    The CS agreed to place a recorded telephone call to WHITE. The CS provided WHITE'S cellular telephone number as (601) 983-9175. During the recorded telephone call, WHITE stated that the insurance policy was current and confirmed that the CS would receive $20,000 off the deal (referring to the murder for hire). The CS also asked WHITE if she wanted an open or closed casket and WHITE responded that "it don't matter cuz his ass getting cremated anyway". WHITE also provided the CS with the intended victim's last name as well as his nickname.

6.    On August 15, 2017, TFO Turner and I met again with the CS. The CS stated that WHITE approached him approximately six months prior regarding the murder for hire plot. The CS also agreed to place another recorded telephone call to WHITE and to introduce to WHITE an ATF undercover (UC) posing as a hitman. The CS called WHITE at (601) 983-9175. During the call, the CS asked WHITE if she had a copy of the insurance policy that she could provide

the hitman as proof that he would be paid at the completion of the murder. WHITE stated that
she did and was willing to provide it to the hitman. The CS told WHITE that the hitman would
call her at some time in the future and establish a time and place to meet. The CS explained to
WHITE that the hitman would refer to himself as "Black" and that he would call WHITE by her
nickname "Tweet". The CS told WHITE that when "Black" called, she (WHITE) would need to
meet with him and discuss the scheme. WHITE agreed to meet with "Black".

7.     On August 23, 2017, TFO Turner and I met again with the CS. The CS agreed to place
another recorded call to WHITE.  During the call, the CS informed WHITE that he/she did not
care which decision she made but asked if she (WHITE) still wanted to "do this". WHITE stated
that she did, so the CS provided WHITE with the telephone number for "Black". The CS
provided the telephone number for the ATF undercover officer[1] (hereafter ATF UC) posing as
the hitman, and WHITE wrote the number down. WHITE then read the number back to the CS
to confirm that it was correct. The CS told WHITE that she could either call or text "Black" and
that she (WHITE) should refer to herself by her nickname, "Tweet". The CS then asked for the
intended victim's telephone number to facilitate contact between the hitman and the victim.
WHITE provided the victim's cellular telephone number.

### August 23, 2017 Undercover Phone Call

8.     On August 23, 2017, the ATF UC received a text message from (601) 983-9175
(WHITE) in which WHITE stated "Hey this Tweet call me". The ATF UC did not respond to the
text message immediately, and approximately nine (9) minutes later the ATF UC received a

---

[1] The ATF undercover officer has 13 years of law enforcement experience and 9 of those years working undercover
assignments.

telephone call from (601) 983-9175 (WHITE). The ATF UC advised WHITE that he was serious

about his willingness to murder her brother on her behalf and stated that he wanted to make sure

that she was on the same page as he was. WHITE stated, "We all on the same page baby, we all

on the same page". The ATF UC advised WHITE that he would need a photograph of her

brother, an address where he could be located, a vehicle tag and proof of the insurance policy,

which detailed the amount of money she would receive after her brother was murdered. The ATF

UC told WHITE that he normally charges $30,000.00 for a murder and asked how much money

he would receive for murdering her brother. WHITE told the ATF UC that he would be paid

$5,000.000 to $6,000.000 for the murder for hire. The ATF UC told WHITE that she would need

to pay him, as close to $10,000.000 as possible if she wanted him to commit the murder. WHITE

acknowledged by stating "Yeah".   A short time later, the ATF UC told WHITE that she had

until the next week to change her mind if she wanted to "back out" on hiring him to murder her

brother. The ATF UC told WHITE that there was no pressure ("No sweat") if she changed her

mind about the murder for hire. WHITE replied, "Yeah, shit I mean, you ain't got to worry about

that you know what I'm saying? Once my mind made up it's made up".


### August 28, 2017 Undercover Phone Call

9.     On August 28, 2017, The ATF UC placed a recorded telephone call to WHITE at (601)

983-9175. The ATF UC asked WHITE if she still wanted to go through with the murder for hire

by stating, "So what's good man? We still good to go"? WHITE responded, "Yeah". The ATF

UC advised WHITE that he would be traveling to Jackson, Mississippi the following morning

and asked her if she had all of the items previously discussed (a photograph of her brother, an

address where her brother could be located, his vehicle tag, proof of the insurance policy and two

cell phones). WHITE stated that she had all of the items except the two cell phones due to the rainy weather and her not leaving her residence. The ATF UC inquired as to how much money she (WHITE) would be able to provide him as a down payment for the murder for hire. WHITE advised that she would have to see how much extra money she had, and was unsure of how much she would be able to provide due to having to pay bills. The ATF UC told WHITE that he understood her financial situation but told her not to forget that she had him "putting in the work" (committing the murder for hire on her behalf) and that he needed payment. WHITE acknowledged the ATF UC's concern and reassured him that he would be compensated for murdering her brother.

### August 29, 2017 Undercover Meeting

10.    On August 29, 2017, the ATF UC called WHITE at (601) 983-9175 and scheduled a meeting with WHITE for that day. The ATF UC told WHITE that he was picking up a rental car and would provide her with a meeting location once he found one. During a second telephone call that day, the ATF UC told WHITE to meet him at the Holiday Inn in Pearl near the Bass Pro store. At approximately 2:37 p.m., WHITE arrived at the pre-arranged location and entered the UC vehicle. I have reviewed the audio/video recording of this meeting and the following summarizes what occurred:

        a.    WHITE provided the UC with one cell phone, a photo of the intended victim, and a copy of the insurance policy. Later during the meeting, WHITE texted the address and telephone number of the intended victim, along with a vehicle description to the UC utilizing her cell phone (601-983-9175).

        b.    The ATF UC asked WHITE how she was related to the intended victim. WHITE

5

responded that she and the intended victim share the same father.

c.   The ATF UC asked WHITE how she would receive the money from the insurance policy. WHITE responded that it would take ten (10) to fifteen (15) days (to receive payment from the insurance company), once she got everything she needed to send to the insurance company. WHITE said, "I did my research and everything". The ATF UC asked WHITE if the insurance policy had a clause regarding the manner of death and WHITE responded "Nope". The ATF UC also asked WHITE if anyone else would get "this bread" (receive a portion of the insurance pay out), to which WHITE responded "Nobody but me, Nobody". Later in the conversation, the ATF UC asks WHITE how he will get his money (for the murder), and WHITE responds "shit, soon as I get that check". The ATF UC asks if he will have to travel back to Mississippi to get his money, and WHITE offers to bring it to him or meet halfway.

d.   During the meeting, the ATF UC provided WHITE with multiple opportunities to change her mind and WHITE remained insistent that she wanted to proceed with the murder for hire. At one point during the meeting, the ATF UC asked WHITE "man you sure, that you sure, that you sure, you want me to kill this nigger?" to which WHITE responds "Yes!" and grins.

e.   WHITE also offers to find a location to conduct the murder and leave the body. WHITE tells the ATF UC that she knows of a "spot" on a "dead end" (street).  The ATF UC asked WHITE to text him the location and/or the address of the "spot". After the conclusion of the meeting, WHITE texted the address "2822 Kelly Ave" to the ATF UC, who replied "the knock off spot?" and WHITE responded "yes".

**August 30, 2017 Undercover Meeting**

11.   On August 30, 2017, at approximately 8:47 p.m. the ATF UC placed a recorded

telephone call to WHITE in which he told WHITE, "I took care of that business" (completed the

murder). The ATF UC instructed WHITE to meet him at the pre-arranged location. At

approximately 9:16 p.m. hours, WHITE arrived at the pre-arranged location and entered the UC

vehicle. I have reviewed the audio/video recording of the meeting and the following summarizes

the meeting:

     a.  The ATF UC asked WHITE if she brought anything of value for him, WHITE

        states that she did not have anything to bring. The ATF UC then explains to

        WHITE that he had to travel to Hammond, Louisiana to find her brother. The ATF

        UC asks WHITE if she is willing provide another $1,000 or $2,000. WHITE states

        that she is willing to "make shit right". The ATF UC tells WHITE that he wants

        $12,000, to which WHITE says in agreement, "alright".

     b.  The ATF UC shows WHITE a staged photo depicting WHITE'S brother with a

        bullet wound to the back of his head and a bloodstain on his back depicting a

        second wound. The ATF UC asks WHITE if the person in the photo is her brother

        to which she replies "yep". The ATF UC then goes into detail describing the

        murder and the number of times he had to shoot the victim. After describing the

        final shot to the victim behind the ear, the ATF UC states, "that did it, so um, I

        mean, it is what it is, it's done now", to which WHITE nods in agreement and

        states "uh-huh, aw yeah".

     c.  The ATF UC and WHITE then begin to discuss a cover story to justify the

telephone calls between WHITE, the ATF UC, the intended victim, and the victim's girlfriend.

d.  After discussing their stories, the ATF UC asks WHITE again, how he will get his money. WHITE explains "I need three reports, the police report, you know what I'm saying, coroner's report, and a death certificate, once I submit that, 10 to 15 days, they gone be processing that check".

e.  Lastly, the ATF UC asked WHITE if she would be willing to assist him in other murder plots to make extra money. WHITE expressed her willingness to participate in other murders with the ATF UC.

f.  At the completion of the meeting, the ATF UC gave the arrest signal and ATF Special Agents arrested WHITE.

## Interstate Facilities

12.   According to a computer search for the service provider for the cellular telephone (601) 983-9175 that WHITE used to call and to receive calls from the ATF UC, the service provider is Sprint Spectrum L.P., or Sprint, a national telecommunications company. The cellular telephone was a facility of interstate commerce.  According to documents filed with the Mississippi Secretary of State's Office, the principal address for Sprint Spectrum, L.P., is Kansas City, Missouri.

## Conclusion

13. Based on the above information, I have probable cause to believe that Velma M. WHITE has utilized a facility of interstate commerce, namely a cellular telephone, with the intent that a murder be committed in violation of laws of the state of Mississippi (Miss. Code.

Ann. § 97-3-19), with something of value, namely money, being promised to be paid in

consideration for the murder, in violation of Title 18, United States Code, Section 1958.

_____ ATF SA
Braden C. Theobald
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives


Sworn to and subscribed before me on this the __31st__ day of August, 2017.

_____
UNITED STATES MAGISTRATE JUDGE

9